2026 IL App (2d) 250277-U
No. 2-25-0277
Order filed February 17, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

---

*In re* ESTATE OF RONALD N. KRAMER
(Kathy Kokoruz and Samuel Kramer, Petitioners-Appellees,
v. Sandy A. Kramer, as Executor of the Estate of Ronald N. Kramer, Respondent-Appellant.)

Appeal from the Circuit Court of Kane County.
Honorable Joseph M. Grady, Judge, Presiding.
No. 20-P-232

---

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

### ORDER

¶ 1    *Held*: The trial court did not err in granting petitioners' renewed motion to enforce a settlement agreement between the parties.

¶ 2    Respondent Sandy A. Kramer, as Executor of the Estate of Ronald N. Kramer, appeals the order of the trial court granting petitioners Kathy Kokoruz and Samuel Kramer's renewed motion to enforce a settlement agreement between the parties. For the following reasons, we affirm.

¶ 3                    I. BACKGROUND

¶ 4    A more thorough recitation of facts may be found in our previous disposition. *In re Estate of Kramer*, 2024 IL App (2d) 230602-U. We recite only those facts necessary for the resolution of this appeal.

¶ 5    Ronald Kramer died on January 23, 2020, and left a will dated January 2, 2020. At the time of his death, Ronald was going through divorce proceedings with his third wife, Diane. Ronald and Diane did not have any children together. His three children—Sandy, Kathy, and Samuel—were born during his first marriage. Diane and Ronald lived at a home in Batavia during their marriage. Diane moved out of the house in 2017 and filed for divorce in March 2018. Ronald's will only made reference to divorce proceedings with an unnamed person and did not mention Diane by name.

¶ 6    On May 8, 2020, Sandy filed a petition for probate of the will. The will left Sandy the entirety of Ronald's estate and named her the executor. The will specifically disinherited Kathy and Samuel "[d]ue to prior generosity shown by" Ronald.

¶ 7    On June 10, 2020, the trial court ordered the will admitted to probate. On June 18, 2020, Diane filed a renunciation of the will. On July 17, 2020, Kathy and Samuel petitioned for formal proof of will.

¶ 8    In August 2020, Sandy, Kathy, and Samuel negotiated a settlement. Sandy's attorney prepared a written settlement agreement, which stated that it was between Sandy, Kathy, and Samuel, and contained signature lines for each of the three siblings (the Family Settlement Agreement). The Family Settlement Agreement provided that each sibling would receive a one-third share of Ronald's net estate, Kathy and Samuel would dismiss their petition for formal proof of the will with prejudice, and Sandy would remain as executor of the estate. One of the recitals stated that Diane had filed a renunciation of Ronald's will and that "[t]he parties anticipated Diane Kramer will withdraw her Petition to Renounce ***."

¶ 9    On August 13, 2020, the trial court entered an order stating that the parties had "resolved the issues relating to the Petition for Formal Proof of Will by way of settlement." The order

continued the case until September 16, 2020, "for entry of an Agreed Order and/or status on the Petition to Renounce."

¶ 10    On October 6, 2020, Kathy and Samuel's attorney emailed Sandy's attorney, stating:

"I had a meeting with Kathy and Sam re: the settlement agreement and they will both sign it. With regards to the items that Sam accused Sandy of taking from the property, they include: guns, ammunition, gun cleaning supplies, tools, antique tackle box, and fishing items and fishing lure collection. Kathy and Sam would also like a list of what was taken from the gun safe and Ron's desk.

Moving forward, both Kathy and Sam are concerned about the maintenance of the property [the Batavia home] and the plan for preparing it for sale. With Sandy living and working out of state, is she going to hire outside help? Although relationships are strained, I think Sam, being local, would likely help where needed. I'm not sure how Diane will fit into all of this either."

Sandy's attorney apparently did not respond. On November 2, 2020, Kathy and Samuel's attorney followed up, saying, "I'm following up on my email from October 6th re: Kathy and Sam agreeing to sign the family settlement agreement and requesting the additional information about Sandy preparing the property for sale, etc. I think we have court next week on this matter."

¶ 11    On February 2, 2021, Kathy and Samuel signed the Family Settlement Agreement.

¶ 12    In March 2021, Sandy told Kathy and Samuel that she would not sign the Family Settlement Agreement "unless and until" Samuel apologized to Sandy for accusing her of stealing items of Ronald's personal property. On March 24, 2021, Samuel sent a text message to Sandy stating, "Sorry for accusing you for taking dads guns."

¶ 13    On April 12, 2021, Sandy's attorney sent a letter to Kathy and Samuel's attorney, stating that "notwithstanding this letter, my client remains willing to sign a Family Settlement Agreement with Kathy granting her 1/3 of the net estate." The letter went on to detail concerns with Samuel's use of Ronald's Batavia home, including apparent illegal burning and dumping waste product on the property. The letter also accused Samuel of stealing "several major items of personal property" from the home. Based on these concerns, the letter stated that Sandy "is not saying that Sam's interest is totally terminated, but there must be some accounting that may affect his percentage going forward."

¶ 14    On May 17, 2021, Sandy filed a petition requesting that a recovery citation be issued to Samuel for personal property he allegedly took from Ronald's estate. On May 20, 2021, Samuel filed a motion for bill of particulars in response to Sandy's petition, seeking to know what personal property Sandy believed he wrongfully took.

¶ 15    On June 17, 2021, Kathy and Samuel filed a motion to enforce the Family Settlement Agreement, arguing that there was a meeting of the minds between the parties, the settlement had been committed to writing, and Sandy's reluctance to sign the agreement was not a basis to modify the agreement. In response, Sandy argued that the initial proposed Family Settlement Agreement was merely for purposes of negotiation and that the parties contemplated adding Diane to any settlement agreement, so there was no meeting of the minds.

¶ 16    On December 15, 2021, the trial court entered an order setting a hearing on the motion to enforce on February 1, 2022. Thereafter, the hearing date was continued numerous times for several years.

¶ 17    On March 29, 2023, Sandy filed a "Motion to Dismiss or Order of Estoppel for Renunciation of Will." On July 19, 2023, the trial court entered an order estopping Diane from

renouncing the will, which formed the basis for the first appeal in this matter. This court reversed the trial court order, determining that Sandy did not prove the elements required to establish promissory estoppel. *Kramer*, 2024 IL App (2d) 230602, ¶¶ 25-26.

¶ 18 On November 12, 2024, following remand, Kathy and Samuel filed a renewed motion to enforce the Family Settlement Agreement, again arguing that there was a meeting of the minds between the parties and that the settlement was not contingent on Diane withdrawing her renunciation. In response, Sandy again argued that the settlement was contingent on Diane withdrawing her renunciation and that the agreement was a draft not signed by all parties. On February 10, 2025, the trial court granted the motion to enforce the Family Settlement Agreement after a hearing. It found that there was a meeting of the minds and that Diane's "agreement to renounce the will was not a condition of settlement." The trial court's written order included a finding that there was no just reason to delay an appeal under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). After unsuccessfully seeking reconsideration of the trial court's ruling, Sandy timely appealed.

¶ 19                                              II. ANALYSIS

¶ 20 Sandy argues on appeal that the trial court erred in enforcing the Family Settlement Agreement because there was no valid and enforceable contract between the parties. The enforcement and construction of a settlement agreement is governed by contract law. *Lampe v. O'Toole*, 292 Ill. App. 3d 144, 146 (1997). An offer, acceptance, and consideration are the basic ingredients of a contract. *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 329 (1977). Additionally, there must also be a meeting of the minds or mutual assent to the terms of a contract for it to be enforceable. *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 20. We will not disturb the trial court's finding of a valid and enforceable settlement agreement

unless it is against the manifest weight of the evidence. *Lampe*, 292 Ill. App. 3d at 146. A judgment is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *In re Estate of Glassman*, 257 Ill. App. 3d 102, 107 (1993).

¶ 21 Sandy first argues that the Family Settlement Agreement lacked consideration because the settlement was contingent on Diane withdrawing her renunciation of Ronald's will. Consideration consists of "the bargained-for exchange of promises or performances, and may consist of a promise, an act or forbearance." *Carter v. SSC Odin Operating Co., LLC*, 2012 IL 113204, ¶ 23. " 'Any act or promise which is of benefit to one part or disadvantage to the other is sufficient consideration to support a contract.' " *Id.* (quoting *Steinberg*, 69 Ill. 2d at 330).

¶ 22 Here, the Family Settlement Agreement is supported by ample consideration by all three parties. Kathy and Samuel agreed to dismiss their petition for formal proof of will with prejudice, while Sandy agreed to give Kathy and Samuel interest in Ronald's estate that was entirely bequeathed to Sandy. This mutual forbearance is sufficient to constitute consideration under Illinois law. See *Sopris Concrete, LLC v. Meeks*, 2022 IL App (2d) 210331, ¶ 24.

¶ 23 Sandy similarly argues that Diane's withdrawal of her renunciation was a condition precedent to settlement and that Diane was a contemplated party to the settlement. A "condition precedent" is an act that must be performed or an event that must occur before a contract becomes effective or before a party is required to perform. *Cathay Bank v. Accetturro*, 2016 IL App (1st) 152783, ¶ 32. Conditions precedent are generally not favored, and courts will only enforce a condition precedent when it is expressed in a plain and unambiguous statement. *Beal Bank Nevada v. Northshore Center THC, LLC*, 2016 IL App (1st) 151697, ¶ 29. When construing a contract, the primary objective is to give effect to the contracting parties' intent and we look to the plain and

ordinary meaning of the language in the contract as the best indication of their intent. *Village of Kirkland v. Kirkland Properties Holdings Company, LLC I*, 2023 IL 127612, ¶ 63.

¶ 24 Here, Sandy argues that the recital stating that "the parties anticipated Diane Kramer will withdraw her Petition to Renounce" expressed a condition precedent to their settlement. However, such language is not a clear and unambiguous indication that Diane's withdrawal of her renunciation was a condition precedent to settlement, but rather an indication of the parties' belief that Diane would withdraw her renunciation. Putting that recital into context with the other two recitals shows that it is part of a summary of the procedural posture of the case when the agreement was reached. Those two other recitals stated that Diane was appointed executor of Ronald's estate under his will, that Kathy and Samuel filed a petition for formal proof of will. There is no language in the recitals, or anywhere else in the agreement, indicating that the settlement is contingent on Diane withdrawing her renunciation.

¶ 25 There is also no evidence that Diane was intended to be a party to the settlement. The Family Settlement Agreement unambiguously states that it is between Sandy, Kathy, and Samuel, and only contains three signature lines, one for each of them. The communications from Sandy's attorney also make this clear, as Diane (or her attorney) was not included in the communications, nor was she mentioned as part of the settlement. Indeed, Diane stated in an affidavit responsive to Sandy's estoppel motion that she had never talked to Sandy regarding the probate proceedings. While Diane's name was mentioned in the October 6, 2020, email from Kathy and Samuel's attorney, it was not in reference to settlement but rather her possible involvement in preparing Ronald's home for sale. Thus, Diane was not intended to be a party to the Family Settlement Agreement and the withdrawal of her renunciation was not a condition precedent to settlement.

¶ 26    Sandy next raises two similar arguments: that the Family Settlement Agreement is unenforceable because it was not signed by all parties and that there was no meeting of the minds. As Sandy acknowledges, it is possible to form a binding written contract without signatures if the parties show mutuality or assent through their acts or conduct. *Hedlund and Hanley, LLC v. Board of Trustees of Community College District No. 508*, 376 Ill. App. 3d 200, 206 (2007). "A meeting of the minds between the parties will occur where there has been assent to the same things in the same sense on all essential terms and conditions." *Pritchett v. Asbestos Claims Mgmt. Corp.*, 332 Ill. App. 3d 890, 896 (2002). Sandy contends that the discussions between the parties demonstrate "a clear breakdown in negotiations" and there were no actions showing a meeting of the minds. We disagree.

¶ 27    The record shows that Kathy and Samuel agreed to the terms of the Family Settlement Agreement negotiated by the parties and drafted by Sandy's attorney, and they later signed that agreement. Sandy also expressed the intent to sign the agreement and an order drafted by Sandy's attorney indicating that the parties had settled their claims was entered by the trial court. These acts plainly demonstrate assent by the parties. "We have long recognized that an agreement to settle pending litigation is effective when arrived at." *Lampe*, 292 Ill. App. 3d at 148. However, Sandy withheld her signature, seemingly based on personal disagreements with Samuel, as they accused each other of stealing items from Ronald's property. Such personal disagreement does not evidence a lack of a meeting of the minds, but rather an attempt to change the terms of the settlement to which she agreed.

¶ 28    Further, the email communications between the parties' attorneys do not show continued negotiations or a lack of a meeting of the minds, as Sandy contends. Rather, the emails show that Samuel and Kathy accepted the terms of the settlement, then Sandy tried to back out. The October

6, 2020, email accepted the Family Settlement Agreement that was written by Sandy's attorney. Sandy's attorney apparently did not respond to this email, and all future communications show only that Sandy was attempting to withdraw or change the agreement as to Samuel's share. For example, the April 12, 2021, email from Sandy's attorney reiterated that Sandy would settle with Kathy but wanted to lower Samuel's share. That email, though, acknowledged that Samuel had an interest in the estate and, if Sandy got her way, it would not be "totally terminated" but his percentage may be affected "going forward." Simply put, there is no evidence of ongoing negotiations, only Sandy's attempts to change the settlement she reached with her siblings.

¶ 29 Finally, Sandy argues that there was no agreement because the October 6, 2020, email was a counteroffer that she did not accept. However, nothing in that email suggests that a counteroffer was proposed. As previously noted, the email addressed three topics: acceptance of the Family Settlement Agreement by Kathy and Samuel; items of personal property alleged to have been removed from Ronald's home; and preparation for selling the home. Nothing in the communication proposed adding or altering terms to the Family Settlement Agreement. Thus, there was no counteroffer necessitating Sandy's acceptance.

¶ 30 Accordingly, the trial court's decision to enforce the Family Settlement Agreement was not against the manifest weight of the evidence.

¶ 31                                 III. CONCLUSION

¶ 32 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 33 Affirmed.